JUDGE PETERS
delivered the opinion op the court:
In April, 1860, the appellant, Hurdt, recovered a judgment in the court of common pleas for the county of St. Louis, State of Missouri, against Kennett McKenzie, for the sum of $912 28, upon which he caused an execution to issue in said month of April, 1860, and placed it in the hands of appellee, Thomas E. Courtenay, who was then the acting sheriff of said county, duly commissioned and qualified. Said execution was returnable to the November term, 1860, of said court.
Before or about the 1st of August, 1860, Courtenay collected the money upon said execution, and returned it satisfied; but failed to pay the same, or any part thereof, to the plaintiff, who then broughthis motion in said court against said Courte-nay, and a part of his sureties in his official bond, and, on the 19th of January, 1861, recovered a judgment against them for the sum of $932.76, with interest after the rate of 10 per centum per annum, from the 19th of November, 1860, till paid.
*141 After the recovery of the last named judgment, this suit was brought in the Louisville chancery court to subject a negro girl-, in possessipn of the wife of said Courtenay, to the payment of it.
It is alleged in the petition that the negro girl was purchased by said Courtenay during the summer of 1860; that he had the title to her made to his brother-in-law, William Clendenen, for the use and benefit of his wife; that Courtenay, at the time, was embarrassed, and owed, and was liable for, greatly more than he was worth, and that the title to said girl was conveyed in trust for his wife in iraud of the rights of his creditors.
The defendants filed separate answers, and Mrs. Courtenay, in her answer, denies the insolvency of her husband at the time he made the conveyance of the slave in trust for her benefit, and says he was then unembarrassed and in easy circumstances as to pecuniary matters. She alleges that the girl was purchased with her moneys derived ;‘from the estate of deceased relatives,” that she was not provided for by any' settlement, or otherwise; and, if her husband had sought to take this money to himself, she is advised that a court of equity would not have permitted him to do so; denies that said conveyance was fraudulent in any' sense whatever, insists that it was fairly, properly, and equitably done, and asks that the attachment be discharged.
T. E. Courtenay, in his answer, denies that at the time he purchased said slave, and conveyed her in trust for the benefit of his wife, he was insolvent, or embarrassed with debts, but says he was then in easy circumstances as to pecuniary matters. ■ '
He also says the money with which the girl was paid for was his wife’s, derived by descent from her deceased relatives, and that the settlement was made because she had not .been previously provided for in any other way; denies the conveyance was made in fraud of the rights of his creditors in any sense, and resists the claim of appellants to subject the slave to the payment of their debt; he does not, however, deny his insolvency at the time his answer was filed, but substantially admits it. ■ ’
*142 Clendenen, the trustee, denies any knowledge of any fraud in the transaction, denies that there was any on his part, and asks for a discharge of the attachment.
There is some proof tending to show that the deed was executed in Missouri, but it is not averred in any of the pleadings that it was executed in that State, and it seems to be conceded in argument that the rights of the parties involved in this controversy, growing out of the deed, must be governed by the laws of Kentucky.
There being no averment in any of the pleadings that the conveyance was made in Missouri, and no proof offered of what the law of that State is on the subject, we are of opinion that the validity of the deed must be tested by the laws of this State. (Surlott vs. Pratt, 3 A. K. Mar., 174.)
One of the grounds relied upon to defeat appellants is, that the girl was paid for with the money of Mrs. Courtenay, which she had inherited, and, as no settlement had been made upon her out oi the money thus inherited, a court of equity would, upon her application, have done what has been done, and therefore the deed should be sustained.
According to the pi oof, Mrs. M. A. Clendenen died in the city of St. Louis, intestate, and without children, in the summer of 1854, or 1855, possessed of a small personal estate and some slaves. She seems to have left no brother or sister surviving her, and J. Speed Peay proves that upon her death her estate passed to the children of her sister, Mrs. Eliza Clende-nen, dec’d., six in number, and of whom Mrs. M. A. Courte-nay was one, and to the children of her brother, Austen L. Peay, dec’d., three in number, of whom the witness was one. He proves that his brother, George N. Peay, and himself, conveyed their interests in their said aunt’s estate to their cousins, Mrs. Courtenay, Ellen Clendenen, now Mrs. Walker, Eliza Julia Clendenen, afterwards Mrs. Butler, and perhaps to John P. Clendenen; he did not know whether his sister joined in said conveyance or not.
The slaves were sold, and the whole estate converted into cash. When this was done, however, does not appear. The appellee, Thomas E. Courtenay, was the administrator, and, *143 from an account taken, or settlement made by him with the probate court, a copy of which is filed, there was, at the June term, 1860, of said court, in his hands the sum of $4,330.43, which, from the proof, we assume was the whole amount of the estate after deducting the cost of administration.
The interest of Mrs. M. A. Courtenay in the estate consisted of cash, and it had been reduced to possession by her husband, who thereby had acquired a complete legal right to it. He did not resort to a court of equity for the purpose of obtaining the possession of the property, or of converting it into cash, nor had such court any control over the matter whatever. Consequently the wife had no equity which could be enforced, and the conveyance can derive no support on that ground. (Bowling and Boucher vs. Winslow's adm'r., 5 B. Mon., 29; 1 Eq. Lead. Cases, 351.)
Even if Courtenay was induced to make the conveyance because he had received the money of his wife, derived from the estate of her aunt, that circumstance is not sufficient in point of law to show that the consideration moved from her; but it must be considered as a voluntary conveyance, and if sustained it will be upon other grounds.
The deed is not filed, nor is its precise date shown by the proof. But, let it be assumed that it was executed before Courtenay had in fact collected the money on appellant Hurdt’s execution, and that he and his assignee are, therefore, to be regarded as subsequent creditors; then, as to them, the conveyance, though voluntary, is not, on that account alone, void under our statute. (Sec. 2, chap. 40, vol. 1 Rev. Stat., 546.)
It then becomes necessary to go into an investigation of the facts, to ascertain whether the transaction is vitiated by fraud.
Thomas M. Barrow proves that he was deputy under Courte-nay while he was sheriff of St. Louis county; that Courtenay was appointed in January, 1860, and ceased to act about the 1st of August of the same year. He also proved that he was the deputy of Cassil, the predecessor of Courtenay; and, as deputy sheriff, he had returned executions against Courtenay just before his appointment, on the 12th of January, 1860, with the endorsements of “nulla bona." One of them was for *144 $2,500, another for $i,100, besides others for amounts not remembered.
He furthermore proved, that he knew, from an examination of his sheriffs books, that Mr. Courtenay owed, in November, I860, money collected on exeeutions, and other processes, to the amount of about thirty-five thousand dollars, much of which was collected prior to July, 1860, and in that month he had a large amount of money in his hands, collected as sheriff; and, from an examination of his books, he believed that Cour-tenay was a defaulter for thirty or thirty-five thousand dollars.
Whitelsey proves that he had known Courtenay for many years; he was without much property, if any, and he believed him to be insolvent at the time he received the appointment 'of sheriff. That the sureties in his official bond had paid, and secured to be paid, over twenty-five thousand dollars, which amount had been collected by Courtenay on executions, whilst he was sheriff, and the greater part thereof he had collected prior to the first of July, 1800. He also proved that Courte-nay’s defalcation would, in his opinion, amount to $30,000 or $35,000; that he derived his knowledge of Courtenay’s defalcation from being counsel for his sureties, and acting for them in settling these claims, and from the statements of Courtenay in a conversation with two of his sureties, when he admitted he had defaulted and had then placed in their hands all the property that he had to transfer to them, to indemnify them, and the whole of it would not amount to three thousand dollars.
On the other hand, a number of deeds are filed, by which divers tracts and parcels of land are conveyed to Courtenay; and two witnesses are introduced to prove his pecuniary condition at the time the settlement was made, one of whom says he was solvent, his credit was good, and he owned lands of the value of twenty thousand dollars. He also proves that his wile’s money, derived from the estate of her aunt, paid for the slave Margaret; but this witness was not present when the girl was purchased, did not see the money paid for her, and does not know to whom it was paid. He does not know *145 whether Courtenay has settled his liability as sheriff, or that his sureties had paid any of his liabilities, and gives no account of what was done with the lands of which he speaks. The other witness knew but little about the condition of Cour-tenay, but supposed he was solvent.
The fact that Mr. Courtenay was indebted to a large amount is proved. In less than one month after the conveyance was made, if it was made at or near the time he purchased the slave, he is overwhelmed in debt; and, in three months thereafter, as a public officer, it is ascertained that he had collected debts of other persons, on process in his hands, to the amount of thirty thousand dollars, and, perhaps, thirty-five thousand, a large part of which his sureties in his official bond have settled, and are liable for the balance, and the means which he exhibits to indemnify them, the witness thinks, will not amount to three thousand dollars, paying not more than one dollar in the hundred. There is no proof that he was engaged during the time in any other business than that of sheriff, or that he embarked in large speculations which proved disastrous, and in which the money might have been lost.
Much the larger portion of the estate of Mrs. Clendenen consisted of slaves,- to a part of which his wife was entitled. If it had been desirable that she should have a slave secured to her separate use, why she did not prefer one of those, being six in number, who had belonged to her aunt, and. with whom she must be presumed to have been acquainted, to one about whom she knew nothing, or if she did it is not shown, is not accounted for.
The short period which intervened between the execution-of the deed and the disclosure of the ruined condition of Mr. Courtenay’s pecuniary affairs; the magnitude of his indebtedness compared with his means of payment; and the rapidity with wffiich this vast debt was created, without any explanation how, or for what, it was created, together with the fact that the conveyance was executed so near the time that the money was collected on appellant’s execution, which has not been accounted for, and no witness can tell how it was applied, we think conclusively establish a fraud.
*146 In the case of Sexton vs. Wheaton the conveyance was upheld. because at the time of its execution it did not appear that the husband was indebted; he had then no intention of entering into commerce; his failure did not occur until two years or more after its execution; and there wasno connection between the debts and the deed — the learned judge remarking, in that case, that they were as distinct as if they had been a century apart. (Sexton vs. Wheaton, 1 vol. Amer. Lead. Cases, 54.) The facts enumerated in that case, and upon which the deed was upheld, are very different from those in this case.
The statute, 13 Elizabeth, chap. 5, was made to protect creditors and others, and a liberal construction in allowing to persons, who are or might be injured by a fraudulent conveyance, the character of creditors under this statute, has always prevailed. Hence it is said: As to rights from contract, any one liable upon a contract, express or implied, though only contingently, is a debtor from the time that the liability is entered into; accordingly a surety is a creditor of the obligor, or co-surety, from the time the obligation is entered into. (Note to Amer. Lead. Cases, 1 vol. page 73, and a.uthorities cited)
it is true that our statute is not in the language of the statute of Elizabeth supra, yet the construction given to that statute by the courts generally was, that a voluntary conveyance was not, as to subsequent creditors, void; but, to render it so, the transaction must have been fraudulent. Hence judicial expositions of that statute may be very properly resorted to as important aids to a correct exposition of ours.
We do not, however, now decide that Mr. Courtenay was in fact a debtor to the plaintiffs from the time the execution was placed in his hands. We do not deem it necessary in this case.
But we are of opinion that the facts herein enumerated, with other circumstances which are shown to have attended the transaction, are such as to establish a fraud, and should avoid the deed.
therefore the judgment is reversed, and the cause remanded ffor further proceedings, consistent with this opinion.